Good afternoon. We'll hear argument this afternoon in Case 22-36049, Tug Construction, LLC v. Harley Marine Financing. Mr. Marino? Good afternoon, Your Honors, and may it please the Court. The trial court's decision should be reversed because plaintiff failed to induce any evidence that the vessels at issue in this case were surveyed by a method that included written and photographic documentation prior to or at delivery, as the bare-boat charters expressly required. Beyond that fatal defect, plaintiff's damages expert admitted at trial that he issued and failed to correct an expert report that he knew falsely inflated plaintiff's damages claim by nearly $300,000. Counsel, on that one with the damages expert, didn't he put an asterisk by the figure? So that's... You can answer my question yes or no first, just to make sure I've got that. No asterisk, a footnote. Yes, he put an asterisk by it, and that was to a footnote. That's correct. He mentioned that he might correct it later. That's correct. Did he correct it later? No, actually he did not. So if I can explain what actually happened, and it's quite different from what the trial court said happened. This expert, Mr. Kelly, would like to just walk you very briefly through how this occurred. Initially, he issued an expert report in September of 2019. In that expert report, he indicated that the $300,000 to repair the engine of the Leila Franco was an estimate, and specifically what he said was that it would be subject to revision after he had the opportunity to review invoices. Well, he had the opportunity to review those invoices. That opportunity came actually after he had issued that September 2019 report. And so he, at this point in time, and this is the finding in the trial court at ER-7, is that he placed an asterisk next to the $281,260.09 in engine repairs. That is completely false. That did not happen. What happened? The trial court, though, kind of begs the question because he did make a credibility finding, and he said that in the respect of the two experts dueling experts, he said that Kelly more accurately sets forth and then he goes on to say. So how do we overturn that credibility finding? Because you're suggesting, as I hear it, that because, in your view, the failure to come back and either remove it or add another asterisk to the report somehow invalidates his entire testimony. No, Your Honor. Let me try to clarify. There's not a credibility issue here at all. It's not as though the judge listened to Mr. Kelly's testimony, listened to Mr. Walther's testimony, and decided one was more credible than the other based on an accurate reading of what they said. The judge, in his findings of fact, stated, the discrepancy regarding the cost to repair the Lila Franco's engines arose because Kelly's pretrial report indicated repairs of $281,260.09 may be needed, subject to further tests and trials. There is not a shard of evidence in the record that Mr. Kelly ever said anything of the sort or that he placed an asterisk after the $281. Which paragraph are you looking at? I'm on page ER9, Your Honor. But what paragraph? Are you in the judge's findings? In the judge's findings. Okay. And what paragraph in those findings? So the paragraph, it's the first full paragraph on page ER9. Rather. Just so you know, we get different ER references depending on which version we're looking at. Oh, I'm sorry. If you could tell us what paragraph of the findings, then it would be easier. So before he began to number the paragraphs, in the first few pages, Judge Toshida has, well, he has, let's see, 1, 2, 3, 4, he has 6. Are we reading from the same thing? I'm reading from the findings of fact and conclusions of law. No, we're not.  I'm sorry, Your Honor. What are you looking at? I'm looking at his order, which is, this is the order that Judge Toshida entered on. Attorney's fees? Order on attorney's fees, interest costs, and award of damages to plaintiffs. Okay. Okay. All right. I apologize. That's not the findings. All right. So in ER9, he says in the first paragraph, the discrepancy regarding the cost to repair the Lila Franco's engines arose because Mr. Kelly's pretrial report indicated engine repairs of $281,260.09 may be needed subject to further tests and trials. Mr. Kelly testified that based upon further tests, only $8,551.00 in engine repairs were needed. That did not happen. That's not what happened. What Mr. Kelly said was initially in September of 2019, he put an estimate, $300,000.00 estimate, right? That $300,000.00 estimate, he dropped his footnote, and it's September 11th, 2019. It says, quote, further... I see where you're going with it. What is the... So let's assume you're right about your characterization of this. What is the remedy that you're asking and that you think is justified? Well, I think that his entire damages report is flawed by the fact that he testified and admitted on cross-examination that he intentionally had left an inaccurate... This is a faults-in-one, faults-in-all argument? It is, Your Honor. That's where I started because now you're jumping from his findings of fact to this final order, and if my question at the outset, and I want to understand your perspective, is that this faults-in-one, faults-in-the-other had to do with the dueling experts and your view that he falsely put in there these numbers, albeit with an asterisk. Right. So are you, in effect, saying that the order with respect to the final damages an attorney sees somehow overrides the findings of fact? No. It's perfectly consistent with the findings of fact. They're equally inaccurate. All right? So finding of fact number 12. I want to make sure I have... It doesn't seem to have anything to do with either the Lila Franco or Mr. Kelly. All about the Lila Franco and... Are you talking about finding of fact 36? Yeah. So in finding of fact 36, he says, on January... Am I in the right place? On January 3rd? All right. So, yes, he issues that, but if you turn to 12. To what? Number 12. The finding of fact number 12. Number 12? Yeah. All right. Indeed, in his initial expert report dated September 11th, 2019, Kelly... Your number 12 of what? Findings of fact. No. That one begins at the time HMS accepted each tugboat. Each tugboat was newly constructed. That's ER 20. I apologize. In his findings of fact, the judge states, and I want to get to the exact right page here. He does talk about Mr. Kelly at paragraph 40. Yes, paragraph 36. In his written report, Mr. Kelly placed an asterisk next to the $300,000 costs for engine repair for Lila Franco. Mr. Kelly explained that cost was provisional, which is why an asterisk was placed next to it and subject to testing, which later revealed $85.51 in repairs were needed. That is not what happened. He issued his first report September 11th, 2019, and in that report, which I have as ER, page 1672, he included an estimate of repairs for the Lila Franco, and in the footnote, he said, quote, further verification being obtained on final CAT repairs, opinions stated herein subject to revision upon review of final CAT repair invoice. That's at page 1676. The final CAT invoices are at pages 1821, 1823, 1827, and 1829, and those four invoices total $281,260.35. He was off by about $0.26, but actually that figure is what he puts in his January 31st, 2020 rebuttal report, ER 1793, at page 1814. There's no asterisk. There's no footnote. There's no suggestion that there's going to be further testing. That did not happen. Right, but your client was not charged for the $300,000 that we're talking about, right? That's correct. So I guess the question becomes, what do you think should happen here? Because you're claiming there's something wrong in this order, but the magistrate judge did hear your experts, otherwise found him credible, Kelly, that is, and awarded damages based on his testimony. You seem to be saying this one inaccuracy should just unravel everything. Well, the reason I say that, Your Honor, is, and this isn't a situation in which we're saying, well, this individual, and I see that I have the yellow light out, and I did reserve five minutes. Is that why the yellow light's on? That's why it's come on. Go ahead. Okay. So here's the point. It's not, the idea is not that because, like, Judge Tushita found as he did, he should have and was enjoined to find false and one false and all. He wasn't. He didn't have to do that. But what he did have to do was base his findings on what actually happened. My question, and I'm sure the presiding judge will give you some leeway. What does it matter when that's not an issue in the end? What matters is when I cross-examined Mr. Kelly, he admitted that he knew in April of 2019 that there was no basis to ask HMS to repair this engine, to replace the engine for $300,000. He knew. They said he knew. End of the day, was there any claim made for that? Yeah, they made a claim until he got on the witness stand. Well, no, I mean at the end of the day. Your client didn't suffer any damage, correct, on that point? That's certainly correct, Your Honor, other than the damage that was devoted to litigating the entire case. I wanted to understand that. Thank you. Can we go back to the first issue, the first issue you raised in your brief? So is it your position that to have any kind of damages following the return of the tugs, there had to have been some formal inspection? Or are you conceding that it doesn't necessarily need to be formal? There can be something else that's akin to that. One hundred percent, they were required to do an on-hire survey. What the testimony was, was no, they didn't do an on-hire survey. What they did was they did a during construction, Mr. Appleton took some photos that were never put into evidence. During construction, that's not when you do the on-hire survey. See, the reason this happened the way it did was because Mr. Franco controlled both companies. He didn't have any need to do an on-hire survey because it was the tug construction existed, was formed solely for the purpose of selling boats to his other company, Harley Marine Services. What happened was the world changed. He got fired. And after he got fired, then it was time to say, wait a minute, now we are going to enforce it. The problem was he couldn't enforce it because he didn't do the on-hire survey. So there was no way to compare. And there is not a drop of evidence in this record as to what happened at the time of delivery. That didn't occur. It was, and he said so, Mr. Franco said it. Mr. Appleton said it. Oh, yeah, we surveyed it during the course of the day. You know, we surveyed it. We took pictures and so forth. But weren't the boats accepted? I mean, they were newly constructed, right? Then they were accepted? The Hank Kaplan conked out eight times on its maiden voyage. There was testimony in the record that there were plenty of problems with these boats. Mr. Franco wanted to accept the boats. And he was in a position to accept them, and he was in a position to say, that's what the bareboat charters say, but it's unnecessary to follow them. The bareboat charters were in place for one reason, and that's because CAT financing required it. That's in the record. It couldn't be clearer. That's why we had bareboat charters, and they're formal, and they say something quite specific. And you know what that is. They say prior to or at delivery, there must be a formal on-hire survey that has photographs and documentation. It doesn't say on-hire. It says method, doesn't it? I mean, it doesn't say on-hire survey. But as I hear you, you're saying that absent an on-hire survey, you have no baseline for determining the language condition. Correct. No benchmark at all. And I ask that question of Mr. Kelly. This is the reality, and it couldn't be clearer in the barebone services. Prior to or at delivery, the vessel shall be surveyed to comprehensively determine its condition, and whatever method they agree on, any method agreed must include written and photographic documentation. Why? So that you actually have a benchmark. It did not exist, and it's not enough to say they were new. New is a temporal thing. Yeah, they were new, but there were lots of problems with new boats, and these pictures and things that were taken before that Mr. Appleton testified about, that was, in some instances, weeks before the boats were actually built. But couldn't the parties agree to do something short of the survey? They could have, but they didn't, and there wasn't a modification here. I hear there's now a last-minute argument about modification. They didn't argue modification. They argued that they complied with the contract. To comply with the contract, they had to have the benchmark there. It seems like by the logic of your argument, your clients could return the boats completely, totally damaged, and there would be no remedy unless this on-hire survey had been conducted. And that sounds crazy, right, Judge? But it's not, and the reason it's not is if you do not have a benchmark, you cannot determine what the cost of damages was. It's impossible. And why? Because they didn't need to do it. Why didn't they need to do it? They didn't need to do it because Mr. Franco owned both companies. Is there any evidence between the time in which the boats were first inspected during the construction and the time that your clients received them that there was any damage to the boats? I know your position is that's their problem, not my problem, but is there actually any evidence that in that several-month period the boats sustained some kind of damage? Sure there was evidence, but the problem was the boats were returned when they were returned. And the answer was, well, you are responsible for this. And the question coming back from HMS was, why? Why are we responsible? What condition was the boat in when it was delivered? I mean, either these contracts mean something or they mean nothing. That's the reality. And this one apparently meant nothing. And the reason it meant nothing is they didn't care. Mr. Franco says it. Mr. Appleton says, I don't have any documentation. I don't have any photos. They're never produced. Why do the bare boat charters require photographs? They require them for exactly this reason, so that when you bring the boat back they can't say, wait a second, that all happened while you had the boat. That didn't happen at the time of delivery. We don't know what happened at the time of delivery. And I don't think there's anything improper or extreme in saying, wait a second, the contract required you to do it and you didn't do it. And that, for one second, to the four invoices that you add up to the 281, those kind of mistakes that Judge Tushita made, they weren't small mistakes. That's a huge mistake. His thing, when I was questioning the witness about it, he said, well, what do you care? Do you want to pay 8,000 or do you want to pay 300,000? Well, that wasn't the point. The point was Mr. Kelly told me he knew in April of 2019 that the 300 was completely bogus, but he put it in his report anyway. And he put it in again. No asterisk. He added up the invoices and he put it in, $281,000. That's what he did. And he did it knowing it. And I said to him, why? Don't you know that you have to sign a report and have to be honest and so on? Yes, I know. Why didn't it happen here? He said, I don't have a good answer for that. Okay, we've let you go over your time, so we're going to let you have a seat and we'll have two minutes up for rebuttal when you come back. Thank you very much, Ron. Thank you. Thank you, Your Honors. May it please the Court, Jess Webster for the respondent, tug construction. I believe you know that these were all custom-made boats. They were custom-built for Harley Marine Services use. They were built Harley Marine specifications and design. And by agreement, the parties had Harley Marine's engineering department serve as the owner's representative throughout the entire course of the construction of these vessels, which I will describe later as way more exhaustive and more comprehensive than what you would ever have on a on-hire survey consisting of a walkthrough on a vessel. And it was through that exhaustive process, which included photographs and reports and testing and sea trials and the creation of punch lists of any known deficiency and the correction of those punch lists, all those deficiency items, before the vessels were finally accepted on charter that ensured that these boats, at the time they went on charter, were brand new and were in perfect condition to the extent knowable. Let me say, though, I thought there's evidence that there were some significant issues prior to the tender. And so when you say they were in new condition, but that was with some caveats, was it not? Well, in the record, if you read Mr. Appleton's testimony, he will confirm that with respect to the one vessel, the Hank Kaplan, they accepted that vessel provisionally because they needed it for a christening ceremony, but subject to a laundry list of things that had to be corrected before it was finally accepted. And he did confirm that the vessel returned to the shipyard, all those deficiency items were corrected, and the vessel was, in his opinion, in perfect condition, brand new, when they made the final acceptance of the vessel from the builder, which was simultaneous to the acceptance of the tugs under the charter agreements. Now, if you would like to hear about the methodology by which these vessels were inspected to confirm their condition, as Mr. Marino noted, in the charter agreements, which were all identical, and were prepared by counsel for Harley Marine at the direction of Harley Marine's CFO, Todd Proffitt, who represented Harley Marine's interests throughout the negotiation of all these charters, contrary to the characterization that Mr. Franco controlled everything, they provided that prior to or at delivery, the vessel shall be surveyed to comprehensively document its condition. The parties may agree an appropriate method by which to survey the vessel and establish its condition, which would include dry docking and or underwater inspection. And it was proven at trial that the agreed method, agreed between Mr. Franco and Mr. Proffitt, was that they would have Harley Marine's engineering department serve as the owner's representative throughout the entire vessel construction, testing, sea trials, and acceptance process. It only makes sense that they do this. These are vessels who are custom-built for Harley Marine to Harley Marine spec. Harley Marine's engineering department had the technical ability to conduct those investigations, and there was multiple witnesses who testified at trial that that exhaustive, continuous process is a far more comprehensive and robust method of establishing the condition of the vessels at the commencement of the charters or when accepted from the builder. There does seem to be some difference of opinion between the two parties as to whether you need, you're talking about something that's either equivalent to or actually in excess of an on-hire survey, and your colleague here says, no, if you stick to the contract, it has to be an on-hire survey. What's your position on that? Well, that's not what the contract says. You know, what it says is that the parties may agree upon the appropriate method by which to survey the vessel and establish its condition. The testimony at trial was also that after undergoing this intensive and robust inspection, testing, and correction methodology at the point that the vessels were accepted, it was, to the best of anyone's knowledge, these vessels were perfect in every respect, and it's for that very reason that, you know, it is customary, and there's testimony of this effect, that after going through that exhaustive process, they don't bother hauling the vessel out again at great expense to take one last look-see at the bottom of the vessel to make sure there's not a problem. And it's also noteworthy the type of problems that were found after the vessels were returned. We're not like a lot of physical damage from striking things. It was primarily electrolysis damage caused by Harley Marine not maintaining the zinc anodes on the vessels with a regular maintenance and repair schedule. Is there anything in the record that, and I recognize that you're saying there's testimony that basically this process that the parties went through during the construction and testing of the vessels qualified as the survey that's referenced in the contract, but is there anything more formal in the record that would indicate that? Well, Your Honor, what is in the record is Mr. Appleton's testimony that he and the head of the engineering department, Mr. Nelson, actually performed all those inspections, which included dry dock inspections before the vessel went in the water, you know, testing the equipment, and that all those inspections were documented with photographs and written reports. How close to delivery did all this take place? Excuse me? How close in time to delivery did all of this take place? Delivery to what other point in time, Your Honor? Delivery to HMF. Well, the delivery from the builder to Tug Construction was simultaneous with the delivery of the vessels from Tug Construction to Harley Marine under the charter agreements. It was one and the same event. Okay. I had maybe understood the other side's position to be there was some time lag between some of these inspections during the construction process and then the eventual delivery of a completed vessel, but is that not the case? Yes, there is some time lag. For instance, when you inspect welds during the weld-up process, you know, there will be some time lag between that and final delivery. But the real test was the final inspections and sea trials that took place just shortly before the delivery of the vessels by the builder and to the charter under the charter. You know, under the Judge Toshida noted that there is absolutely no evidence that these vessels sustained any damage during that interim between launch and delivery and that, at best, Harley Marine only had speculations that something could have happened. And as I said, customarily in the industry, after going through that exhaustive inspection process, which, as I said, included photographs and written reports, you know, they don't bother or incur the expense to haul the vessel again just to look at the underside. And getting back to the reports and the photographs, I wanted to emphasize that Mr. Appleton confirmed that throughout the entire process, the conditions of the vessel was documented with photographs and with written reports and that there was a final report written upon final acceptance of the vessels and that he turned all those reports over to the engineering department at Harley Marine. And they actually discussed those reports at the weekly engineering department meetings. He also testified that when his employment was terminated, he turned over his laptop to Harley Marine, which contained all his copies of those photographs and reports. Now, we don't know. There was no evidence at trial as to what Harley Marine did with that collection of reports and photographs. But Mr. Appleton clearly testified it was all done, it was all delivered. But it's noteworthy that none of Harley Marine's witnesses at the trial controverted any of that testimony and said that, no, he had not in fact done those reports, turned over those photographs. Rather, we're left to speculate as to what happened to those. And I would also note, as I put in my supplemental citation of authorities, you know, the parties, if they wish, they could have selected a selection inspection method that didn't include photographs and written reports because under maritime law, alteration, modification or waiver of a marine contract provisions may be implied by the acts of the parties in the circumstances surrounding performance of the contract. There is ample evidence in the record as to what the parties agreed to do. In fact, it did include written reports and photographs. We're just left to speculate as to what happened to those. Do you want to address this issue with the $300,000 figure on Mr. Kelly's expert report? Yes. Do you would like me to address that or do you have a specific question? No, I'd like to hear your response to what we heard from your opposing counsel. Well, first of all, Mr. Kelly testified for days. He was on the stand longer than any witness in this case, and Judge Tashita had ample opportunity to observe his demeanor, to observe the way he conducted himself in performing these repairs and made findings that affirmed that he acted with alacrity and integrity and fairness in going about the process. So there is a lot in the record that Mr. Judge Tashita was relying upon in making his credibility determination. What we're talking about here is one line item in a laundry list of damage claim items. And as to this one line item, contrary to what Mr. Marino said, Mr. Kelly didn't confirm that there was no basis for including that line item in the claim initially or that it was completely bogus. Instead, the record reflects that he considered that item of damages to be a close call because the initial testing showed that there was not excessive wear, even though the engines had been run up to the very brink of the point where the engine manufacturer, CAT, would require a total rebuild of the engines. And eventually, his reservations on that one allied item of damages caused him to recommend to Tug Construction that it not pursue that item of damages in the claim. And Tug Construction, which is run by Mr. Redd, who is himself an expert with respect to tractor tugs and their operation, he disagreed because he believed that the reports from Caterpillar Tractor were conclusive and due to the number of engine hours that had been run. Can you help me understand this? So in the initial report, he put down a figure of $300,000. That's correct. Elsewhere in the record, there is a figure of $281,000 and change. Correct. What's the $281,000? Is that a revised figure? Excuse me? What does the $281,000 represent? That was after the actual cost of rebuilding the engines for the Laila Franco had been determined. But ultimately, we allow, what, $8,000? Well, after the decision was made to withdraw that claim item entirely, making this entire line of impeachment on a collateral issue, yes, there was only $8,000 in repairs and getting the engines back on warranty. Okay. The argument, as I heard it, was, well, he had around $300,000, he had an asterisk, but he actually goes into trial not modifying his report. That's correct. And that is what I think they see as the nub of his apparent dishonesty or at least a basis for completely disregarding his expert analysis. So why, in your view, did Judge Tshida not make an error? Well, in my view, you know, the decision to not pursue that item of damages because it was such a close call was made right on the brink of trial. And in retrospect, a supplemental report was in order, but it was not performed. But even if that were to constitute a big lie, you know, there was a plethora of other testimony and evidence that Judge Tshida relied upon in making his credibility determination. Okay. So they make the decision. Who makes the decision not to seek the larger amount, the $281,000? Ultimately, it was made between Mr. Kelly's recommendation and Mr. Red accepting that recommendation. And that was done before trial? I think the day before trial. Okay. And so when Mr. Kelly gets on the stand, is he still pushing for the $281,000? And does the $8,000 figure, does he admit it by your side or is that elicited by the other side on cross-examination? No. It was announced to the court and made clear that that line item of damages for the rebuilding was withdrawn. Was withdrawn and being corrected and being lowered to $8,000. That's correct. You know, ultimately, Mr. Kelly's decision to withdraw that item due to it being a close call, if anything, reflects on his integrity to not pursue an item of damages in this case that wasn't absolutely clear. And when you say it was a close call, it was a close call as to whether this was attributable to misuse of the engines or it was a close call as to whether the engines needed repair? Correct. It was a close call whether the amount of wear on the engines was beyond what is normal wear and tear. Because the engines were going to need $281,000 worth of refurbishing but you were only going to seek $8,000. Am I correct on that? That's correct. Okay. All right. So the engines were going to need to be overhauled, but the question was whether that was the ordinary use of the engines or whether it was extraordinary. That's correct. The engines actually were overhauled, but the question was whether or not it's something that Harley Marine should have been held accountable for. And initially, Mr. Kelly believed it was something that was Harley Marine's responsibility, but it was a close call. And at the time of trial, it was decided that because he, you know, felt it was a close call, it was withdrawn. And we only pursued clear items of damage that were sustainable. We'll let you go over your time, Mr. Webster, but let me see if my colleagues have any further questions for you. Thank you very much for your argument this afternoon. Thank you, Your Honor. And we'll hear rebuttal from Mr. Marino. Thank you very much, Your Honor. Just to be clear, Mr. Kelly knew in April of 2019 that that $300,000, which represented fully 20% of the claim damages, was not proper. That's what he testified to. He knew it in April. He knew it in September, but in September, he put his $300,000 with the footnote in subject to the rules. When you say it was not proper, you mean it was not an accurate figure, or it was not legally attributable to your client? It was not legally attributable to our client. And what happened here is they got all these boats fixed, and then they gave us the bill. And so with the $300,000, and this is, I mean, let's be clear about this. It's not a question of credibility. The guy told me that he knew that this $300,000 was not right, and he capitulated and allowed his client to let him inflate the damage figure. And then Judge D'Shida didn't get it respectfully at all. He thought this is an asterisk that this guy put there, and then, hey, you know, he took a look at the invoices. He took a look at further testing. There's nothing there about further testing. He put the $300,000 in because he didn't have the exact number. But at the end of the day, when the judge is looking at, well, should I reduce the attorney's fees because of potential time spent on this, he says, no, it didn't matter. I mean, he succeeded at trial. It didn't matter to him at all. Just understand this. No, wait. I'm saying what the judge said, but was time spent at the trial proving that it was $281,000 or $8,000? No, time was spent defending it all the way up to the trial. Up to the trial. Including like in his pre- So I just want to be clear that by the time of trial, it was acknowledged that Tug was no longer pursuing that damage, correct? That's absolutely right. At the time of trial, it was acknowledged. The problem was this. I understand what the problem was in your view, but I just wanted to be clear about the time. Mr. Maynard, I guess I still don't understand what the implications of that are. Does that mean that the district judge's findings are clearly erroneous? Your client doesn't get charged for this amount, so what's the problem? The problem is that, yes, the district judge's findings, the magistrate judge's findings were clearly erroneous. He said that this guy put in asterisks there and all of that. But at the end of the day, Mr. Maynard, your client doesn't get charged for that. That's right, but that's not how it works. You don't get to put in false reports, not once but twice. He ridiculed Mr. Walther's report in his rebuttal in 2020. He ridiculed it and said, of course this was- Ms. Marino, we see all kinds of cases where people compromise on damages that they claim. And sometimes they decide that they can't make something stick that they thought they could when they started the case. And if this is a case about whether or not this was ordinary wear and tear or extraordinary wear and tear, those are judgments, and the difference between $281,000 in extraordinary wear and tear and $8,000 in extraordinary wear and tear is a big amount. But at the end, your client doesn't get charged for that. I think I've not made myself clear, and I apologize for that. The problem is related to the overall credibility of this witness. If judges- In fact, you got done telling me that credibility is not an issue. No, but the overall- Well, I'm sorry, Your Honor. So I'm now totally- Well, I think I can illuminate. When I say credibility is not an issue, this is not about us coming to say, well, Judge Tushita found that he was credible, but you should reverse it. That's not what I'm saying. Judge Tushita said he put an asterisk there, he got further testing, and then he changed his mind. That's dead wrong. That's not what happened. What happened was he was bullied into putting it in and carrying it all the way through discovery. He put in a rebuttal report that ridiculed, absolutely ridiculed the idea that that $300,000 wasn't our responsibility. And then as we get up to trial, I say, you know what, it's not $300,000, it's $8,000. That's all I'm saying with respect to that. With respect to the on-hire, I must just say one thing. Yes, the bare-boat charter says that you can agree on the method. What's the method they agreed on? There's no method agreed upon. There were no photographs. There was no documentation. They didn't do it. And we know why they didn't do it. But now to come here and say, well, there was a lot of stuff done during construction. I mean, at the end of the day, it's not going to work that way. It doesn't work that you get to say, even though the bare-bone charters are quite specific about the need for photographic and written documentation, and they're quite specific as to why, so that you can compare the on-hire to the off-hire. Okay. Well, I think we've let you go over your time, Mr. Marino. Let me see if my colleagues have any further questions for you this afternoon. I want to thank you for your presentation, Mr. Marino, and I want to thank opposing counsel, Mr. Webster, for his. And this matter is submitted. Thank you very much.  Thank you. Thank you, Your Honor.
judges: McKEOWN, BYBEE, BRESS